IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

NYSHELLE WYNN,

                    Plaintiff,

      v.                                          Civil Action No. 3:21cv530

CITY OF RICHMOND, VIRGINIA
POLICE DEPARTMENT

        and

DETECTIVE SANDY LEDBETTER-CLARKSON,
in her individual and in her official capacity as an
officer of the City of Richmond, Virginia's Police Department,

                    Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on the City of Richmond Police Department ("RPD")

and the City of Richmond's ("Richmond" or "the City") Motion to Dismiss Plaintiff Nyshelle

Wynn's Amended Complaint (the "Motion to Dismiss"). (ECF No. 7.) Wynn brings this action

against RPD; Richmond;[1] and Detective Sandy Ledbetter-Clarkson, both in Ledbetter-Clarkson's

---

[1] Although the caption of Wynn's Amended Complaint is less than clear, the substance of her Amended Complaint makes plain that she intends to sue *both* RPD and Richmond. (*See, e.g.*, ECF No. 5, at 1 (referring to "Defendant City of Richmond, Virginia").) Likewise, although RPD and Richmond's Motion to Dismiss is entitled "*City of Richmond, Virginia Police Department's* Motion to Dismiss the Amended Complaint Pursuant to Rule 12(b)(6)," (ECF No. 7 (emphasis added)), the substance of their Memorandum in Support demonstrates that the Motion to Dismiss was filed on behalf of both RPD and Richmond, (*see* ECF No. 7, at 1 (arguing that, "[t]o the extent that the [Amended] Complaint may be construed as suing the City of Richmond and The Richmond Police Department separately, the Richmond Police Department is not a separate entity and should be dismissed as the Richmond Police Department is not a suable entity separate and apart from the City of Richmond." (internal quotation marks omitted)). Moreover, the Memorandum in Support consistently refers to actions and contentions

individual capacity and in her official capacity as an officer of RPD.[2]   In her Amended

Complaint, Wynn claims that the Defendants violated her constitutional rights as protected by 42

U.S.C. § 1983[3] and the Fourth and Fourteenth Amendments of the United States Constitution

when Ledbetter-Clarkson used excessive and unreasonable force against Wynn, arrested Wynn

without probable cause, and illegally searched Wynn's purse and home without a warrant.  (ECF

No. 5.)

　　　The Richmond Defendants filed a Motion to Dismiss Wynn's Amended Complaint, (ECF

No. 7), but Ledbetter-Clarkson did not, instead filing an Answer, (ECF No. 6).  Wynn responded

to the Richmond Defendants' Motion to Dismiss, (ECF No. 9), and the Richmond Defendants

replied, (ECF No. 10).

　　　These matters are ripe for adjudication.  The Court dispenses with oral argument because

the materials before it adequately present the facts and legal contentions, and argument would

---

of "the City."  (*See generally* ECF No. 7.)  The Court therefore construes the Amended
Complaint as lodging actions against the three Defendants listed above:  RPD, Richmond, and
Ledbetter-Clarkson.

[2] The Court refers to RPD and Richmond collectively as the "Richmond Defendants."

[3] This statute provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken in such officer's judicial
> capacity, injunctive relief shall not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  "Section 1983 'is not itself a source of substantive rights,' but merely
provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v.
Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollaon*, 443 U.S. 137, 144
n.3 (1979)).

not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.[4]  For the reasons that follow, the Court will grant the Motion to Dismiss. The Court will also strike Wynn's claim for punitive damages against the Richmond Defendants.

## I.  Factual and Procedural Background

### A.  Factual Background[5]

Wynn's claims stem from her interactions with Officer Ledbetter-Clarkson while Ledbetter-Clarkson was on duty as an RPD officer. (ECF No. 5 ¶¶ 7–32.) "On August 3, 2019, Ms. Wynn and her friend were standing in front of their apartment talking when Ledbetter-Clarkson and her partner pulled up in front of Ms. Wynn's home in a possibly unmarked police vehicle." (ECF No. 5 ¶ 8.)  "Ledbetter-Clarkson exited the vehicle and approached them" but "did not identify herself as a Police Officer." (ECF No. 5 ¶¶ 9–10.)  She was wearing a shirt and slacks, with a bulletproof vest underneath, "but no departmental identification of any form." (ECF No. 5 ¶ 11.)

After approaching Wynn and her friend, Ledbetter-Clarkson asked both individuals for their names. (ECF No. 5 ¶ 12.)  Wynn identified herself, but Ledbetter-Clarkson "accused Ms. Wynn of lying." (ECF No. 5 ¶ 13.)  She asked Wynn for photo identification, and "after a back

---

[4] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a).  Wynn brings her claims under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. (ECF No. 5, at 1.)  The Court exercises supplemental jurisdiction over Wynn's state law claims, as they arise from the same case or controversy as her federal law claims.  28 U.S.C. § 1367(a).

[5] For the purpose of a Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

and forth[,] Ms. Wynn told Ledbetter-Clarkson that she would go into her apartment and get her ID." (ECF No. 5 ¶ 14.)

Yet, unbeknownst to Wynn, Ledbetter-Clarkson followed Wynn into the apartment. (ECF No. 5 ¶ 15.) "Wynn tried to shut the apartment's front door in order to keep her children inside," but "Ledbetter-Clarkson prevented Ms. Wynn from doing so by sticking her foot in the door." (ECF No. 5 ¶¶ 16–17.) "Ledbetter-Clarkson then refused Ms. Wynn's request that she leave." (ECF No. 5 ¶ 18.)

Ledbetter-Clarkson's refusal to leave "frightened Ms. Wynn," who began "putting her children into their rooms and locking their doors." (ECF No. 5 ¶¶ 19–20.) Wynn then "picked up her younger child" while "moving toward her purse containing her ID." (ECF No. 5 ¶ 21.) "[D]espite Ms. Wynn carrying her small child," Ledbetter-Clarkson grabbed Wynn and "pushed [her] and threw her against a wall." (ECF No. 5 ¶¶ 22–23.) She "then yelled at Ms. Wynn that locking children in their rooms was child neglect[,] . . . called for backup[,] . . . [and] refused to allow Ms. Wynn to produce her identification until additional RPD Police Officers arrived." (ECF No. 5 ¶¶ 24–25.) "Wynn's friend began recording Ledbetter-Clarkson, which ultimately resulted in less aggression and silence by Ledbetter-Clarkson." (ECF No. 5 ¶ 26.)

Eventually, "RPD [officers] escorted Ms. Wynn outside of her apartment . . . while Ledbetter-Clarkson searched Ms. Wynn's purse." (ECF No. 5 ¶ 27.) "Ultimately, Ledbetter-Clarkson realized that Ms. Wynn had properly identified herself." (ECF No. 5 ¶ 28.) Wynn was taken into custody and "charged with child neglect and assault on a law enforcement officer," but "[t]hese charges were dropped and/or dismissed." (ECF No. 5 ¶¶ 29–30.) "Ledbetter-Clarkson's conduct caused Ms. Wynn to suffer mental distress and pain, requiring medical attention [and]

4

continued counseling." (ECF No. 5 ¶ 31.) She also suffered "economic damage including but not limited to, medical and counseling . . . expenses and lost wages." (ECF No. 5 ¶ 31.)

**B.** **Procedural Background**

Wynn originally filed suit in the Richmond City Circuit Court, and the Richmond Defendants properly removed the case to this Court. (ECF No. 1, at 1.)[6] The Richmond Defendants filed a Motion to Dismiss Wynn's original Complaint, (ECF No. 2), and Wynn filed an Amended Complaint as a matter of right, (ECF No. 5).[7]

Wynn brings eight Counts[8] in the Amended Complaint:[9]

**Count I:** Unreasonable Seizure and Excessive Force, in violation of 42 U.S.C. § 1983. Wynn at no time "g[a]ve Ledbetter-Clarkson any reason to believe that [she] presented a significant threat of death or serious bodily injury to [Ledbetter-Clarkson] or anyone else." (ECF No. 5 ¶ 34). "At all times relevant to this Complaint, Ledbetter-Clarkson was employed with the RPD, and acting within the course and scope of her employment as an officer with the RPD." (ECF No. 5 ¶ 39.) ("Unreasonable Search and Excessive Force Count.")

**Count III:** Deprivation of Substantive Due Process Rights, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment. Ledbetter-Clarkson "acted with deliberate indifference to the constitutional rights of Ms. Wynn with the purpose to harm unrelated to any legitimate law enforcement objective" when she conducted an unconstitutional arrest. (ECF No. 5 ¶ 44.) ("Unlawful Arrest Count.")[10]

---

[6] The Court employs the pagination assigned by the CM/ECF docketing system.

[7] The Court denied as moot the Richmond Defendants' Motion to Dismiss Wynn's original Complaint. (ECF No. 11.)

[8] Wynn inadvertently skipped Count II in her Amended Complaint.

[9] Wynn does not specify which Defendants against whom she brings each Count. Nevertheless, the Court will presume for the purposes of this Opinion that all Counts apply to the Richmond Defendants, and that Counts I, III, and VI through IX apply to Ledbetter-Clarkson.

[10] Although some of the allegations in Count I also relate to an unlawful arrest, the Court treats Count III as the Unlawful Arrest Count because Count III more clearly complains of an unconstitutional arrest. (*See* ECF No. 5 ¶ 44 (alleging that Ledbetter-Clarkson "unconstitutionally arrested" Wynn).) In so doing, the Court considers all pertinent allegations in Count I as part of Count III.

**Count IV:** Municipal Liability for Unconstitutional Custom or Policy, in violation of 42 U.S.C. § 1983. The Richmond Defendants "knowingly maintained, enforced and applied an official recognized custom, policy, and practice" of (1) employing police officers the Richmond Defendants "knew or reasonably should have known had dangerous propensities for abusing their authority," (2) inadequately supervising officers with this propensity, (3) failing to "adequately train officers" and "institute appropriate policies" regarding arrest and use of force, and (4) inadequately training police officers "with respect to making proper and constitutional arrests." (ECF No. 5 ¶ 51.) ("Unconstitutional Custom or Policy Count.")

**Count V:** Municipal Liability for Failure to Train, in violation of 42 U.S.C. § 1983. RPD's training policies "were not adequate to train its police officers . . . with regards to making proper constitutional arrests" and resulted in officers' inability "to handle the usual recurring situations with which they must deal." (ECF No. 5 ¶ 60.) ("Failure to Train Count.")

**Count VI:** False Imprisonment, in violation of Virginia common law. Ledbetter-Clarkson "intentionally deprived Ms. Wynn of her freedom of movement by use of force, threats of force and unreasonable duress." (ECF No. 5 ¶ 68.) ("State Law False Imprisonment Count.")

**Count VII:** Malicious Prosecution, in violation of Virginia common law. Ledbetter-Clarkson "maliciously, and without probable cause, arrested Wynn for child neglect and assault on a law enforcement officer." (ECF No. 5 ¶ 74.) ("State Law Malicious Prosecution Count.")

**Count VIII:** Battery, in violation of Virginia common law. All Defendants "jointly and severally caused Ms. Wynn to suffer an unwanted touching without justification, excuse or consent," (ECF No. 5 ¶ 77), and all Defendants "are jointly and severally indebted to her for the damages caused by the battery." (ECF No. 5 ¶ 81.) ("State Law Battery Count.")

**Count IX:** Assault, in violation of Virginia common law. All Defendants "jointly and severally[] put Wynn in reasonable fear of imminent physical injury without justification, excuse, or consent," (ECF No. 5 ¶ 83), and all Defendants "are jointly and severally indebted to Ms. Wynn for damages caused by the assault." (ECF No. 5 ¶ 86). ("State Law Assault Count.") The Court refers to Counts VI through IX collectively as the "State Law Counts."

In response to the Amended Complaint, the Richmond Defendants filed the instant

Motion to Dismiss, seeking to dismiss all Counts in the Amended Complaint and Wynn's prayer

for punitive damages. (ECF No. 7, at 1.) Wynn responded, (ECF No. 9), and RPD replied, (ECF

No. 10).  For the following reasons, the Court will grant the Motion to Dismiss.  The Court will dismiss all Counts against RPD and all Counts against Richmond.  The Court will also strike Wynn's claim for punitive damages against both Richmond Defendants.

## II.  Standard of Review:  Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint's statement of the claim may be "short and plain," but must both (1) contain sufficient factual information to "state a claim to relief that is plausible on its face" and (2) extend beyond mere legal conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

A complaint reaches facial plausibility when the allegations support a reasonable inference of defendant liability. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, the complaint must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citations omitted).  The Court must assume all well pleaded factual allegations are true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 678-79; *see also Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, this presumption is not extended to conclusory legal statements. *Iqbal*, 556 U.S. at 679.

### III. Analysis

The Richmond Defendants move to dismiss all Counts against them and move to strike[11]

Wynn's request for punitive damages as to them. Because Wynn cannot properly sue the

Richmond Police Department as a separate entity from the City of Richmond, the Court will first

grant the Motion to Dismiss with respect to all claims against RPD. The Court then concludes

that Wynn has sufficiently alleged underlying Fourth Amendment violations. However, with

respect to *Monell* liability, the Court will grant the Motion to Dismiss the Unconstitutional

Custom or Policy Count (Count IV), as Wynn does not allege adequate facts to show an

unconstitutional policy or custom. The Court will also grant the Motion to Dismiss the Failure to

Train Count (Count V), as Wynn likewise fails to state sufficient facts to establish a failure to

train attributable to Richmond. Next, the Court will dismiss the State Law Counts (Counts VI

through IX) against Richmond because Ledbetter-Clarkson was performing a "governmental

function" during the incident. Finally, the Court will strike Wynn's request for punitive damages

against both Richmond Defendants because no claims against those Defendants remain.

### A.     Wynn Fails to State Any Claim Against RPD

As an initial matter, the Court will dismiss all counts in the Amended Complaint against

RPD. "Where a party is neither an individual nor a corporation, the party's capacity to be sued is

determined by the law of the state where the federal district court sits." *Mukuna v. Gibson*, No.

1:11cv493, 2011 WL 3793336, at *5 n.2 (E.D. Va. Aug. 25, 2011) (citing Fed. R. Civ. P.

17(b)(3); *Thompson v. City of Danville*, No. 4:10cv12, 2011 WL 2174536 (W.D. Va. June 3,

---

[11] Although the Richmond Defendants move to "dismiss" Wynn's request for punitive damages, such a motion is properly brought under a Motion to Strike pursuant to Federal Rule of Civil Procedure 12(f). *Nedrick v. Southside Reg'l Med. Ctr.*, No. 3:19cv202, 2020 WL 534052, at *3 (E.D. Va. Feb. 3, 2020). Thus, the Court will treat this portion of the Richmond Defendants' Motion to Dismiss as a Motion to Strike.

2011)). "Under Virginia law, which applies in this context, 'an operating division of a governmental entity . . . cannot be sued unless the legislature has vested the operating division with the capacity to be sued.'" *Id.* at *5 (quoting *Guerrero v. Deane*, No. 1:09cv1313, 2010 WL 670089, at *17 (E.D. Va. Feb. 19, 2010)). Courts have previously concluded that "nothing in Virginia law recognizes municipal police departments as entities separate from their respective municipalities." *Hearn v. Hudson*, 549 F. Supp. 949, 952 n. 1 (W.D. Va. Apr. 23, 1982) (dismissing claims against a municipal police department); *see, e.g.*, *Lucas v. Henrico Pub. Sch. Bd.*, No. 3:18cv402, 2019 WL 5791343, at *3 (E.D. Va. Nov. 6, 2019) (stating that "several courts in this Circuit have dismissed claims against police departments in Virginia, holding that they lack the capacity to be sued" and dismissing the plaintiff's claims against a municipal police department).

No Virginia statute or regulation allows the Richmond Police Department to be sued separately from the City of Richmond. Therefore, the Court will dismiss all Counts against RPD. *See Hearn*, 549 F. Supp. at 952 n.1; *Lucas*, 2019 WL 5791343, at *3.

## B.      Wynn Sufficiently Alleges Underlying Fourth Amendment Violations in Counts I and III

Wynn claims that Ledbetter-Clarkson subjected her to an unreasonable search and seizure using excessive force, and deprived her of substantive due process by arresting her without probable cause.[12] (ECF No. 5 ¶¶ 36, 44). Although Richmond presumes the existence of

---

[12] Although Wynn frames her claim of "unconstitutional[] arrest[]" as a Fourteenth Amendment Substantive Due Process Clause violation, (ECF No. 5 ¶ 44), all of Wynn's substantive constitutional claims are properly brought under the Fourth Amendment, not the Due Process Clause. *Emesowum v. Arlington Cnty.*, No. 1:20cv113, 2020 WL 3050377, at *4 (E.D. Va. June 5, 2020) ("[A]s the Supreme Court has made clear, allegations of false arrest, malicious prosecution, and unlawful seizure are all governed not by the procedural and due process components of the Fourteenth Amendment, but by the Fourth Amendment (incorporated in the Fourteenth Amendment)." (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989))); *see Wiggins v. Quesenberry*, 222 F. Supp. 3d 490, 497–99 (E.D. Va. 2016) (discussing the distinction between

underlying constitutional violations for the purposes of its Motion—instead only contesting the sufficiency of Wynn's municipal liability allegations—such constitutional infringements are a necessary element of municipal liability pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Thus, this Court first addresses Wynn's substantive constitutional claims and concludes that she has stated violations of her Fourth Amendment rights to be free from excessive force, illegal searches, and arrest without probable cause.

### 1.    Wynn Sufficiently Alleges That Ledbetter-Clarkson Applied Excessive Force

#### a.    Legal Standard:  Excessive Force

To prevail on an excessive force claim under the Fourth Amendment—as applied to the states through the Fourteenth Amendment—a plaintiff must demonstrate that the force used was objectively unreasonable. *Graham v. Connor*, 490 U.S. 386, 396–98 (1989); *Kingsley v. Hendrickson*, 576 U.S. 389, 392 (2015). "The assessment of objective reasonableness is not mechanistic, but is evaluated based on the 'facts and circumstances of each particular case.'" *Wiggins v. Quesenberry*, 222 F. Supp. 3d 490, 500 (E.D. Va. 2016) (quoting *Graham*, 490 U.S. at 396). "Thus, while reasonableness is an objective test, it is based on the perspective and knowledge of the defendant officer." *Id.* (citing *Graham*, 490 U.S. at 396). "A court must weigh the nature of the intrusion on the plaintiff's rights 'against the countervailing governmental interests at stake,' . . . which requires an assessment of the totality of the circumstances." *Id.* (quoting *Graham*, 490 U.S. at 396). Courts should therefore "evaluat[e] factors such as the

---

Fourth and Fourteenth Amendment claims in excessive force actions); *see also Graham*, 490 U.S. at 395 ("*All* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment . . .").

The Court construes all of Wynn's constitutional claims—excessive force, unreasonable search, and false arrest—as arising out of the Fourth Amendment. (*See* ECF No. 5, at 3 (invoking the Fourth and Fourteenth Amendments).)

amount of force used, the extent of the plaintiff's injuries, the severity of the predicate crime, the immediate threat posed by the suspect, and whether [the suspect] resisted arrest or attempted to flee." *Id.*

### b. The Force Ledbetter-Clarkson Applied Was Not Objectively Reasonable

Wynn plainly alleges that Ledbetter-Clarkson used disproportionately severe force when she threw Wynn against a wall. After the Court resolves, as it should at this stage, all reasonable inferences in Wynn's favor, the Court finds that Wynn was not fleeing or resisting arrest. Instead, she simply walked back into her home to retrieve her identification after telling Ledbetter-Clarkson that she would do so. (ECF No. 5 ¶ 14–15.) Based on the facts alleged, she did not commit *any* underlying crime that might justify force—she merely locked her children in their rooms. Nothing about Wynn locking her children in their rooms under these circumstances even approaches any violation of the Virginia crime of child endangerment, much less the high standard needed to meet it.[13] Indeed, as alleged, Wynn had committed *no* underlying crime that would justify the use of some level of force. To the contrary, Wynn exercised her parental rights by protecting her children from what she perceived to be physical danger. And Wynn certainly posed no immediate threat—she was carrying her child while Ledbetter-Clarkson threw her against the wall. (ECF No. 5 ¶¶ 22–23.) Lastly, Wynn states that she suffered injuries from

---

[13] Virginia Code § 18.2-371.1(A) provides that it shall be a felony for "[a]ny parent . . . who by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child." The statute includes as examples of "serious injury" "(i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, (vi) forced ingestion of dangerous substances, and (vii) life-threatening injuries. Moreover, subsection (B) provides that it shall be a felony for "[a]ny parent . . . whose willful act or omission in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life." Va. Code § 18.2-371.1(B).

Ledbetter-Clarkson's force, which "requir[ed] medical attention" and "continued counseling." (ECF No. 5 ¶ 31.)

In sum, accepting the Amended Complaint's allegations as true and drawing all reasonable inferences in Wynn's favor, the Court concludes that the force that Ledbetter-Clarkson deployed was grossly disproportionate to any threat that Wynn might have posed. The force applied was, in other words, objectively unreasonable. Wynn therefore states an underlying claim for excessive force under the Fourth Amendment against Ledbetter-Clarkson in the Unreasonable Search and Excessive Force Count (Count I).

### 2. Wynn Sufficiently Alleges That Ledbetter-Clarkson Illegally Searched Her Apartment and Purse

#### a. Legal Standard: Unlawful Searches

The "very core" of the Fourth Amendment's prohibition on unreasonable searches and seizures of the people's "persons, houses, papers, and effects" is "the right of a [person] to retreat into [their] own home and there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). "Thus, '[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Hunsberger v. Wood*, 570 F.3d 546, 553 (4th Cir. 2009) (alteration in original) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)); *see Payton*, 445 U.S. at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be reasonably crossed without a warrant.").

The Supreme Court has carved out some narrow exceptions to this general rule. *Id.* Relevant here, "a police officer may search a home without a warrant if, in an emergency, the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Hunsberger*, 570 F.3d at 553

12

(internal quotation marks omitted) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). "For example, law enforcement officers in hot pursuit of a suspected felon may chase their quarry into a home without seeking judicial authorization." *Id.* (citing *Warden v. Hayden*, 387 U.S. 294 (1967)). Alternatively, "[t]hey may enter a dwelling to prevent imminent destruction of evidence." *Id.* (citing *Ker v. California*, 374 U.S. 23 (1963)).

Another "exception to the warrant requirement authorizes searches incident to a lawful arrest." *United States v. Davis*, 997 F.3d 191, 195 (4th Cir. 2021) (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)). "The search-incident-to-arrest exception allows arresting officers to search both 'the arrestee's person and the area 'within [the arrestee's] immediate control.'" *Id.* (quoting *Davis v. United States*, 564 U.S. 229, 232 (2011)). "Of course, it is settled that to justify a search incident to arrest, the arrest must be valid." *Duhart v. United States*, 476 F.2d 597, 598 (6th Cir. 1973) (per curiam) (citing *Henry v. United States*, 361 U.S. 98, 102 (1959)).

Officers may also conduct "inventory search[es]" of personal effects without obtaining a warrant. "A proper inventory search is merely 'an incidental administrative step following arrest and preceding incarceration,' . . . conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to [their] jailing.'" *United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007) (quoting *Illinois v. Lafayette*, 462 U.S. 640, 644, 646 (1983)). "Such inventory searches, however, must 'be conducted according to standardized criteria.'" *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987)). "Standardized search procedures must be 'administered in good faith' for their attendant searches to satisfy the Fourth Amendment." *Id.* (quoting *Bertine*, 479 U.S. at 374). "That is, an inventory search conducted pursuant to standardized

13

procedures is valid 'so long as the purpose of the inventory is . . . not to gather incriminating evidence against the owner.'" *Id.* (quoting *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986)).

**b.      Ledbetter-Clarkson's Search of Wynn's Home and Purse Was Illegal**

To begin, Wynn articulates sufficient facts to plausibly state that Ledbetter-Clarkson illegally searched her apartment.  Ledbetter-Clarkson's entrance into Wynn's residence is presumptively unreasonable because she did not procure a warrant to do so.  *Hunsberger*, 570 F.3d at 553.  Nor, on these facts and at this stage, could Ledbetter-Clarkson claim she entered Wynn's apartment out of exigency:  Wynn *told* Ledbetter-Clarkson that she would retrieve her identification from her apartment. (ECF No. 5 ¶ 14.)  Perhaps an exigency may have arisen if Wynn had retreated into her home and failed to return within a reasonable amount of time.  But affording Wynn's allegations the deference they are due at this stage, the Court finds that that did not happen here.  Indeed, Ledbetter-Clarkson prevented Wynn from closing her front door *just* as Wynn entered her apartment. (ECF No. 5 ¶¶ 15–17.)  In short, based on the facts alleged in the Amended Complaint, Ledbetter-Clarkson's warrantless, nonconsensual entry into Wynn's apartment was unreasonable, and no exception to the warrant requirement shields her conduct.

Ledbetter-Clarkson's search of Wynn's purse was likewise unreasonable.  Again, Ledbetter-Clarkson obtained no warrant to search the purse.  And she cannot claim that the search-incident-to arrest exception applies.  As an initial matter, it is not clear that Wynn was properly arrested.  *See Duhart v. United States*, 476 F.2d at 598.  Beyond that, however, her purse appears to have not been on her person or within her immediate control.  She states that "[a]s the RPD escorted [her] outside of her apartment building . . . Ledbetter-Clarkson searched Ms. Wynn's purse." (ECF No. 5 ¶ 27.)  Presumably, then, the purse had been left inside Wynn's

14

apartment or was otherwise inaccessible to Wynn as other officers escorted her outside. The Fourth Circuit has recently held that the police were not permitted under this exception to search a person's backpack when the person was handcuffed and was "not within reaching distance" of it. *Davis*, 997 F.3d at 198. So too here. The Court reasonably infers that Wynn did not retain ready access to her purse, and based on that fact, "it was [not] reasonable for [Ledbetter-Clarkson] to believe that [Wynn] could have access[ed] [her purse] at the time of the search." *Id.* at 198 (internal quotation marks omitted).

Finally, the inventory exception does not render the search of Wynn's purse reasonable. Inventory searches must be "conducted according to standardized criteria," and must be "administered in good faith." *Banks*, 482 F.3d at 733. The purpose of the inventory search must *not* be "to gather incriminating evidence against the owner." *Id.* Again drawing all reasonable inferences in Wynn's favor, the Court finds that Ledbetter-Clarkson appeared to search Wynn's purse not as a routine attempt to catalogue the purse's belongings, but in an effort to locate Wynn's identification. Wynn plausibly alleges that Ledbetter-Clarkson demanded to know Wynn's identity and to see her identification. (*See, e.g.*, ECF No. 5 ¶¶ 12–14.) And after "Ledbetter-Clarkson searched Ms. Wynn's purse," she "realized that Ms. Wynn had properly identified herself." (ECF No. 5 ¶¶ 27–28.) The Court thus has ample facts to infer at the Motion to Dismiss stage that Ledbetter-Clarkson did not inspect Wynn's purse according to a routine inventory procedure with the purpose of "securing the [bag] or its contents." *Brown*, 787 F.2d at 932; *see also Banks*, 482 F.3d at 741 ("Banks may only succeed in challenging the search of the bags . . . by showing that Det. Gun's search was motivated by an investigatory police motive." (internal quotation marks omitted)). Thus, the Unreasonable Search and Excessive

Force Count (Count I) plausibly states a claim for an unreasonable search against Ledbetter-Clarkson.

### 3. Wynn Sufficiently Alleges That Ledbetter-Clarkson Arrested Her Without Probable Cause

#### a. Legal Standard: Unlawful Arrest

The Fourth Amendment also allows for a claim of false arrest. "An arrest is a seizure under the Fourth Amendment, and such a seizure is reasonable only if based on probable cause." *Pleasants v. Town of Louisa*, 524 F. App'x 891, 897 (4th Cir. 2013). "Probable cause 'to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "Whether probable cause exists must be determined 'in light of all the surrounding circumstances.'" *Id.* (quoting *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998)). "Probable cause requires more than 'bare suspicion' but requires less than evidence necessary to convict." *Porterfield*, 156 F.3d at 569.

#### b. Wynn Has Alleged Sufficient Facts to Show That Ledbetter-Clarkson Arrested Her Without Probable Cause

As her final claim brought under Section 1983, Wynn contends that Ledbetter-Clarkson "unconstitutionally arrested her."[14]  (ECF No. 5 ¶ 44.)  For the reasons articulated in Part III.B.1.b., *supra*, Wynn also pleads sufficient facts to state a constitutional false arrest claim. Viewed favorably, the Amended Complaint plausibly establishes that Ledbetter-Clarkson had no probable cause to believe that Wynn had committed any violation that would justify arrest:

---

[14] As stated *supra*, although Wynn brings this claim under the Fourteenth Amendment's Substantive Due Process Clause, the Court properly construes this Count as arising under the Fourth Amendment.

Wynn notified Ledbetter-Clarkson that she would step into her apartment to retrieve her identification and did exactly that.  She then sought to exclude Ledbetter-Clarkson from her residence, as was her right.  And she fearfully locked her children in their rooms for an unspecified—but seemingly brief—period of time.  *See Pleasants*, 524 F. App'x at 898 ("[T]he application of *de minimis* force by a parent does not automatically create probable cause for arrest").  To establish otherwise, Ledbetter-Clarkson must later produce additional facts to show that she did, indeed, possess probable cause to arrest Wynn, but that reaches beyond the scope of the instant Motion.  Looking only to the facts alleged in the Amended Complaint, the Court concludes that Wynn has adequately pled a false arrest claim under the Fourth Amendment in the Unlawful Arrest Count (Count III) and any such claim in the Unreasonable Search and Excessive Force Count (Count I).

Accordingly, the Court concludes that Wynn has stated claims in Counts I and III that Ledbetter-Clarkson infringed upon her constitutional rights to be free from excessive force, unreasonable searches, and unreasonable seizures.

### C.   Wynn Fails to Adequately Plead an Express Policy or Custom or a Failure to Train Pursuant to *Monell*

The Court next addresses whether Richmond can be liable to Wynn under well-established theories of municipal liability.  The Court concludes that Wynn fails to state sufficient facts under an unconstitutional express policy theory, an unconstitutional custom theory, or a failure to train theory.

### 1.   Legal Standard:  *Monell* Liability

"For purposes of Section 1983, a municipality is considered a 'person' and thus is subject to suit."  *Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978)).  Although an underlying constitutional

violation is a *necessary* element of municipal liability, it is not *sufficient*: a municipality cannot "be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 553–54 (quoting *Monell*, 436 U.S. at 691). Liability will arise "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible [for] under § 1983." *Id.* at 554 (quoting *Monell*, 436 U.S. at 694). "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

The Fourth Circuit has identified four avenues through which a § 1983 plaintiff may demonstrate municipal liability for a policy or custom:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens;" or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). The Amended Complaint attempts to establish *Monell* liability under the first, third, and fourth avenues: express policy, deliberate indifference through failure to adequately train officers, and practice or custom. (ECF No. 5, at 7–10.)

### a.    Express Policy

A "municipality may deprive a plaintiff of [their] constitutional rights, triggering *Monell* liability under Section 1983, through an express policy embodied in written ordinances or regulations." *Moody v. City of Newport News, Va.*, 93 F. Supp. 3d 516, 531 (E.D. Va. 2015). "[T]he enactment of legislation [i]s the prototypical government conduct that can give rise to

18

liability under *Monell*[]." *Berkley v. Common Council of City of Charleston*, 63 F.3d 295, 299 (4th Cir. 1995) (en banc).

### b.  <u>Deliberate Indifference Through Failure to Train</u>

A municipality's failure to train may support § 1983 liability where the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact," *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989), and is the "moving force [behind] the constitutional violation." *Id.* at 389 (internal quotations omitted).  This municipal liability theory thus has two components in addition to an underlying constitutional violation:  deliberate indifference and causation.

To amount to "deliberate indifference," a failure to train must reflect the municipality's "deliberate" or "conscious" choice. *Id.* at 379.  A "deliberate" choice requires that the municipality have "fair *notice* that subordinates are engaged in constitutional or statutory deprivations," and regardless "consciously chose[] a particular course of action in response." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 703 (E.D. Va. 2004).  Plaintiffs may establish deliberate indifference in two ways.  First, they may show that "policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Moody*, 93 F. Supp. 3d at 538 (quoting *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F.Supp.3d 721, 726 (E.D. Va. 2014)).  Second, they may demonstrate that the municipality has failed to train its employees on "an obvious constitutional duty that particular employees are certain to face." *Id.* at 538 (quoting *Gallimore*, 38 F. Supp. 3d 726).  This second method is limited, however, to a "narrow scope" of constitutional duties. *Tobey v. Napolitano*, 808 F. Supp. 2d 830, 843 (E.D. Va. 2011).

A plaintiff must also demonstrate a "causal nexus" between the deficient training and the alleged constitutional violation. *Brown*, 308 F. Supp. 2d at 694.  Generally, a plaintiff cannot

demonstrate a causal connection "by proof of a single incident of unconstitutional activity alone." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994). Rather, a plaintiff must show that the "deficiency in training actually caused" the violation. *Canton*, 489 U.S. 378, 391. However, in limited cases, a single incident can constitute support for a causal connection where the constitutional duty is so obvious that without proper training, "the specific violation [was] 'almost bound to happen, sooner or later.'" *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987) (quoting *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985)).

### c. <u>Custom or Practice</u>

Plaintiffs may also sue municipalities for constitutional deprivations "pursuant to governmental 'custom,' even though such a custom has not received formal approval through the body's official decision[-]making channels." *Monell*, 436 U.S. at 690. To determine whether a practice is persistent enough to constitute a custom with the force of law, a plaintiff must demonstrate that the "duration and frequency" of the practice "indicate[s] that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens v. Baltimore City State Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014) (internal citations omitted). Lastly, the plaintiff must identify "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 385.

### 2. <u>Wynn Insufficiently Alleges a Policy or Custom</u>

Wynn's Amended Complaint fails to adequately allege that Richmond embraced either an express policy or a widespread custom of the constitutional violations asserted here. In support of both theories, Wynn claims that Richmond "knowingly maintained, enforced, and applied an official custom, policy, and practice," (ECF No. 5 ¶ 51), of:

(1) Employing officers RPD "knew or reasonably should have known had dangerous propensities for abusing their authority and . . . failing to follow written RPD Police policies and General Orders." (ECF No. 5 ¶ 51(a).)

(2) Inadequately supervising and disciplining officers that RPD "knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits." (ECF No. 5 ¶ 51(b).)

(3) Inadequately training officers on arrests and proper use of force. (ECF No. 5 ¶ 51(c–d).)

(4) "Failing to institute appropriate policies" regarding arrests and use of force. (ECF No. 5 ¶ 51(c).)

But Wynn identifies no formal RPD policy "embodied in written ordinances or regulations," *Moody*, 93 F. Supp. 3d at 531, that violated her constitutional rights. Wynn's assertion that a formal policy violated her rights without identifying any specific policy constitutes a "mere conclusory statement[]" that is "devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678.

Her suggestion that Richmond also developed a "custom" of "tolerat[ing]" such inadequacies fares no better because it rests on pure conclusions as well. (ECF No. 5, at 8.) In *Owens*, the defendant alleged that the Baltimore City Police Department ("BCPD") violated his constitutional rights by intentionally withholding exculpatory evidence resulting in his wrongful conviction, for which he served over twenty years in prison. *Owens*, 767 F.3d at 385, 387. Owens alleged that this withholding resulted from a "'custom, policy, and/or practice' of [BCPD] condoning its officers' conduct in 'knowingly, consciously, and repeatedly with[holding] and suppress[ing]' exculpatory evidence." *Id.* at 402 (second and third alterations in original). Crucially, the United States Court of Appeals for the Fourth Circuit found that Owens' allegation that BCPD had "reported and unreported cases. . . of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions" was sufficient to render

his *Monell* claim "plausible on its face." *Id.* at 403 (internal quotations omitted). The Court noted that these specific allegations were integral to the Plaintiff's success. *Id.* ("Owens has done more than [allege mere conclusions]: Owens has alleged facts . . . which, if true, would buttress his legal conclusion.").

*Moody v. City of Newport News* similarly illustrates how plaintiffs asserting an "unconstitutional custom" theory under *Monell* must at least allege *some* facts supporting the existence of the custom beyond mere "labels and conclusions." 93 F. Supp. 3d 516, 542 (E.D. Va. 2015). There, Moody brought a § 1983 claim based on officers' alleged use of excessive force when repeatedly shooting into Moody's car, claiming that the City "maintained customs . . . amounting to deliberate indifference to the constitutional rights of Plaintiff and the public." *Id.* at 543 (internal quotations omitted). While the court found this assertion conclusory by itself, it ultimately concluded that Moody's allegation regarding a specific 2007 shooting that resulted in death, in combination with more general allegations of routine failure to investigate excessive force claims, were sufficient to facially demonstrate a custom of "failing to adequately investigate excessive force claims." *Id.* at 543 (internal quotations omitted).

Here, however, Wynn's Amended Complaint is bereft of facts to plausibly allege an improper custom. She merely claims that Richmond "[e]mploy[ed] and retain[ed] as police officers and other personnel, including Ledbetter-Clarkson[,] whom the City . . . knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens." (ECF No. 5 ¶ 51(a).)[15] But she does not include a single additional allegation to support this contention. She does not, for example, state that Richmond had

_____

[15] The three following subparagraphs—¶ 52(b)–(d)—concern a failure to train rather than an unconstitutional policy or custom. The Court will address Wynn's failure to train theory below.

received several other complaints relating to unlawful searches or uses of force, *cf. Owens*, 767 F.3d at 403, nor does she allege even one other instance of similar unconstitutional conduct, *cf. Moody*, 93 F. Supp. 3d at 543.  To be sure, "for the purposes of surviving a motion to dismiss, a plaintiff 'need not plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Id.* at 542 (quoting *Jordon by Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994)).  Nevertheless, Wynn does not allege sufficient facts to plausibly state a claim that Richmond has a custom of retaining dangerous and abusive officers.  The Court will accordingly dismiss the Unconstitutional Custom or Policy Count (Count IV).

### 3.     <u>Wynn Insufficiently Alleges a Failure to Train</u>

Likewise, the Amended Complaint fails to set forth sufficient facts to establish *Monell* liability pursuant to a failure to train theory.  Wynn states that "the training policies of the defendant City's Police Department were not adequate to train its police officers . . . with regards to making proper constitutional arrests."  (ECF No. 5, at 9–10.)  "As a result," she contends, "City police officers, including Ledbetter-Clarkson, are not able to handle the usual and recurring situations with which they must deal, including making contact with innocent civilians, who have done nothing wrong, but who are nevertheless presumed guilty."  (ECF No. 5, at 10.)  In sum, "[t]he Defendant Police Department was deliberately indifferent to the known or obvious consequences of its failure to train its police officers . . . with regards to making proper constitutional arrests."  (ECF No. 5, at 10.)  And "[t]he City was aware that failure to implement some sort of training with respect to making proper arrests would result in continuing to have numerous unwarranted arrests by its Police Officers."  (ECF No. 5, at 10.)

Wynn's allegations regarding RPD's failure to train constitute the same type of legal conclusions that other courts within this district have already held cannot survive a motion to dismiss. For instance, in *Lee v. City of Richmond* (a case involving troubling facts), the court assumed that officers had applied excessive force yet concluded that Lee failed to plead non-conclusory facts to show that Richmond could be liable for failure to train the officers. No. 3:12cv471, 2013 WL 1155590 (E.D. Va. Mar. 19, 2013). In that case, officers arrived at a private residence. *Id.* at *1. The resident, Fleming, "retreated to an upstairs bedroom and barricaded himself inside." *Id.* Fleming's father, Lee, arrived at the residence and informed the officers that Fleming did not possess a firearm. *Id.* Lee requested that he be allowed to enter the residence in an attempt to "convince Fleming to surrender peacefully," but "Lee was not allowed to do so." *Id.* Instead, the officers threw a tear gas cannister into the room where Fleming was located. *Id.* Fleming exited the room "while exhibiting symptoms common to exposure to tear gas" and "fell to the floor." *Id.* "At that point, [the officers] fired a total of nine rounds at Fleming, who was struck multiple times in his sides, torso, and chest. Fleming subsequently died." *Id.*

Lee attempted to establish *Monell* liability on behalf of Richmond by, among other things, arguing that the City inadequately trained its officers. *Id.* at *1. Lee averred that: "(1) the training was inadequate . . . ; (2) the inadequate training constitute[d] deliberate indifference . . . ; and (3) the risk of constitutional injury as a result of such deliberate indifference . . . is very obvious." *Id.* at *7 (internal quotation marks omitted) (second and fourth alterations in original). The court concluded that these scant allegations were inadequate to impose liability upon the City, as they were "the exact type of 'labels and conclusions and a formulaic recitation of the elements of a cause of action' that *Twombly* says 'will not do.'" *Id.* (quoting *Bell Atlantic Corp.*

24

*v. Tombly*, 550 U.S. 544, 555 (2007)).  Indeed, the court more precisely concluded that Lee had "not alleged any, much less sufficient, facts to render 'plausible' a claim . . . that the 'violation of a federal right [was] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (second alteration in original) (quoting *Hill v. Robeson Cnty.*, 733 F. Supp. 2d 676, 687 (E.D.N.C. 2010)); *accord Brown v. Cobb*, No. 3:17cv627, 2018 WL 3080064, at *3 (E.D. Va. June 21, 2018) (discussing plaintiffs' "vague and conclusory allegations about the City's failure to train").

Wynn's allegations as to RPD's failure to train its officers regarding arrest procedures are similarly—and fatally—conclusory.  Just as in *Lee*, Wynn simply states that RPD's training policies "were not adequate."  (ECF No. 5, at 9–10.)  As the *Lee* Court articulated, to allow a plaintiff to establish municipal liability by merely reciting the theory's elements would be to "functionally expose the City to *respondeat superior* liability, which has been explicitly foreclosed by *Monell*." *Lee*, 2013 WL 1155590, at *7.  To prevail under the single-incident failure to train theory derived from *Canton*, 89 U.S. 378, plaintiffs must allege some facts to render plausible the notion that the training was *so* inadequate that a constitutional violation was "bound to happen, sooner or later," *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987).  Wynn has not done so here.  Accordingly, her failure to train theory must fail.

The Court recognizes that another case within this district may suggest a different conclusion:  *Moody v. City of Newport News*, 93 F. Supp. 3d 516 (E.D. Va. 2015).  There, the plaintiff alleged that:

> 'the need for specialized training' [concerning the use of deadly force] . . . 'is so obvious' and the 'inadequacy of the training . . . is so likely to result in the violation of constitutional and federal rights . . .' that the 'failure to provide such specialized training . . . is deliberately indifferent to those rights such as those described herein' because of the 'duties and responsibilities of those police officers that participate in arrests.'

*Moody*, 93 F. Supp. 3d at 539 (second, third, fourth, and fifth alterations in original).  Moody

claimed that when six officers shot and paralyzed him in his car, the police used deadly force

unconstitutionally.  *Id.* at 524.  The *Moody* court ultimately held that, "read in a light most

favorable to Plaintiff, he alleges that the police officers that participate in arrests require special

training because of the obvious risk, absent such training, that an armed officer might

unconstitutionally seize a suspect, yet, the City has not provided them with such specialized

training."  *Id.* at 539.

However, this Court finds *Moody* inapposite for two reasons.  First, in *Moody*, the

plaintiff alleged that at least one other similar incident had occurred earlier:  officers shot and

killed a person during an attempt by six officers to arrest him.  *Id.* at 523–24.  While the court

held that this additional incident did not establish "deliberate indifference through acquiescence

in a *pattern* of constitutional violations," *id.* at 539 (emphasis added), this earlier incident helped

establish "beyond the speculative level that the City's alleged failure to *correct* . . . training

deficiencies made an incident" like Moody's "bound to happen, sooner or later," *id.* at 540

(emphasis added).

Second, Moody plainly alleged that the municipality imposed *no* training whatsoever

with respect to use of deadly force.  *Id.*  Here, Wynn's allegations are not as clear.  In one

instance, she states that "the training policies of the defendant City's Police Department were not

adequate to train its police officers . . . with regards to making proper constitutional arrests."

(ECF No. 5, at 9–10.)  This implies that she believes that RPD has adopted some sort of arrest

policy, but that the policy is inadequate.  But later, she alleges that "[t]he City was aware that

failure to implement some sort of training with respect to making proper arrests would result in

continuing to have numerous unwarranted arrests by its Police Officers."  (ECF No. 5, at 10.)  In

26

other words, she at best vaguely suggests that RPD might not have any policy at all to guide

arrest procedures. Certainly, a complete failure to train with regard to bedrock police

responsibilities such as arrests could render constitutional violations "bound to happen, sooner or

later." *Moody*, 93 F. Supp. 3d at 540. But in the face of Wynn's vague and contradictory

allegations, the Court cannot infer that Wynn alleges that RPD has wholly failed to adopt an

arrest policy.

Accordingly, the Court will dismiss the Failure to Train Count (Count V).

### D. Wynn's Virginia Common Law Tort Claims Fail Because Ledbetter-Clarkson Was Performing a Governmental Function During the Incident

In addition to her constitutional claims, Wynn contends that Ledbetter-Clarkson

subjected her to false imprisonment, malicious prosecution, battery, and assault under Virginia

common law. (ECF No. 5 ¶¶ 67–86.) Wynn does not allege a theory of liability that would

implicate Richmond in this conduct, so the Court will assess these claims under a theory of

vicarious liability. Because Ledbetter-Clarkson was performing a governmental function during

the incident that gave rise to this case, the Court will dismiss Wynn's state law tort claims

against Richmond to the extent they are brought pursuant to vicarious liability.

### 1. Legal Standard: Immunization from Liability While Employees Perform Governmental Functions

Because Wynn's Virginia common law claims come before the Court under supplemental

jurisdiction, the Court will apply Virginia substantive law when addressing them. *See Erie R.*

*Co. v. Tompkins*, 304 U.S. 64 (1938). The Virginia Supreme Court in *Niese v. City of Alexandria*

held that municipalities are "immune from liability for intentional torts committed by an

employee during the performance of a governmental function." 564 S.E.2d 127, 133 (Va. 2002);

*see id.* (noting that it "agreed with Fourth Circuit precedent" on this issue, *i.e.*, *Carter v. Morris*,

27

164 F.3d 215 (4th Cir. 1999)).  For the purposes of tort liability, a governmental function

involves "the exercise of an entity's political, discretionary, or legislative authority."  *Id.* at 132

(quoting *Carter v. Chesterfield Cnty. Health Comm'n*, 527 S.E.2d 783, 785 (Va. 2000)).  In

contrast, proprietary functions are "ministerial" and "assumed in consideration of the privileges

conferred by . . . charter."  *Carter*, 527 S.E.2d at 785 (quoting *City of Richmond v. Long's

Adm'rs*, 58 Va. 375, 379 (Va. 1867), *rev'd on other grounds*, *First Virginia Bank-Colonial v.

Baker*, 301 S.E.2d 8 (Va. 1983)).  "[A] municipal corporation acts in its governmental capacity

in . . . maintaining its police force."  *Niese*, 564 S.E.2d at 132 (quoting *Hoggard v. City of

Richmond*, 200 S.E. 610, 611 (Va. 1939) (alterations in original)).  More specifically, a police

officer acts within their governmental capacity when "investigat[ing] a citizen's complaint."

*Niese*, 564 S.E.2d at 133; *see id.* at 132.

### 2.   Ledbetter-Clarkson Was Performing a Governmental Function During the Incident

In this case, Ledbetter-Clarkson was acting within her governmental capacity during her

altercation with Wynn.  Indeed, Wynn concedes that during the incident, Ledbetter-Clarkson was

"working as a police officer for the City, and acting within the course and scope of her duties."

(ECF No. 5 ¶ 68.)  Just as an officer was "certainly" acting pursuant to his "governmental

function of providing a police force" when the officer committed intentional torts while

investigating a citizen's complaint, *Niese*, 564 S.E.2d at 133, so too were Ledbetter-Clarkson's

actions committed pursuant to a governmental function.

Accordingly, the Court will dismiss Wynn's State Law Counts (Counts VI through IX)

against Richmond.

### E.     The Court Will Strike Wynn's Prayer for Punitive Damages

Lastly, the Court will strike Wynn's requests for punitive damages against both RPD and Richmond because no Counts in the Amended Complaint remain against either party. *eServices, LLC v. Energy Purchasing, Inc.*, 3:09cv671, 2010 WL 11566025, at *2 (E.D. Va. Mar. 2, 2010) ("There being no claim for compensatory damages remaining, a claim for punitive damages cannot lie.").

## IV.  Conclusion

For the foregoing reasons, the Court will grant the Richmond Defendants' Motion to Dismiss.  (ECF No. 7).

The Court will dismiss all Counts against RPD and Richmond and will strike Wynn's request for punitive damages against both parties.  The Unreasonable Search and Excessive Force Count (Count I), the Unlawful Arrest Count (Count III), and the State Law Counts (Counts VI through IX) remain against Ledbetter-Clarkson in their entirety.[16]

The Court will dismiss the above mentioned Counts *without prejudice*.  The Court will allow Wynn leave to amend her Amended Complaint.

An appropriate order shall issue.

Date:   6-28-2022
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

---

[16] Counts IV and V pertained only to the Richmond Defendants.